**In re Leonard S. LYLE, d/b/a Northstar Construction, Debtor.**

**Robert F. Lucas, Jr., and Rachel F. Lucas, Plaintiff,**

**v.**

**Leonard S. Lyle, d/b/a Northstar Construction, Defendant.**

**Bankruptcy No. 03–10446–WCH.**

**Adversary No. 03–01166.**

United States Bankruptcy Court, D. Massachusetts, Eastern Division.

May 23, 2005.

---

Thomas J. Raftery, Carlisle, MA, for Debtor.

## MEMORANDUM OF DECISION

WILLIAM C. HILLMAN, Bankruptcy Judge.

### I. Introduction

This adversary proceeding is before the Court pursuant to an order of remand. I previously entered judgment for Leonard S. Lyle (the "Debtor") on the complaint which Robert F. Lucas and Rachel F. Lucas ("Mr. Lucas" and "Mrs. Lucas," respectively, the "Plaintiffs" collectively) brought under 11 U.S.C. § 523(a)(2)(A) (the "Complaint"). Specifically, I ruled

that the Plaintiffs had failed to establish a required element of the test outlined in *Palmacci v. Umpierrez*, 121 F.3d 781 (1st Cir.1997), namely that their reliance upon an alleged false representation by the Debtor caused them damages. The Plaintiffs appealed to the United States District Court for the District of Massachusetts and that court remanded the matter for further consideration of the *Palmacci* elements.

Upon remand, I held a hearing and took the matter under advisement. For the reasons set forth herein, I will enter judgment for the Debtor. The following constitute my findings of fact and conclusions of law.

## II. Background

### A. Factual Background

The chronology of events which led to this proceeding is straightforward and not disputed. In the early spring of 2000, the Plaintiffs were searching for a contractor build an addition to their home. John M. Gregorio ("Gregorio"), a family friend of the Plaintiffs (who at the time was the Building Commissioner of the City of Melrose, Massachusetts) recommended the Debtor to the Plaintiffs.[1] After Gregorio's recommendation, Mrs. Lucas telephoned the Debtor to arrange a meeting concerning the Plaintiffs' project.[2]

At their first meeting with the Debtor, the Plaintiffs discussed their preliminary drawings and various details of their project to build an addition and make renovations to their home.[3] During the meeting, Mrs. Lucas testified the Debtor presented the Plaintiffs with his business card.[4] The Northstar Construction Company business card names the Debtor as "Project Manager" and recites the following: "BLDR Lic. # 046646[;]" "Contractors # 110571[;]" and, "DOE Cerificate # 267513."[5] The Debtor admitted that *Exhibit A2* is the business card he had at the time, but did not recall presenting it to the Plaintiffs.[6]

Both Plaintiffs testified that during the first meeting Mr. Lucas inquired of the Debtor whether he was licensed, to which the Debtor responded that he was.[7] The Plaintiffs testified that they used licensure as a "standard" for the contractors they interviewed for their project[8] and relied upon the Debtor's representation in deciding to contract with him.[9] The Debtor testified that his response to whether he was licensed was "that I hadn't been licensed, that it had lapsed, but yet I had taken a test in 1987 to receive my license, and I hadn't forgot the material because I was teaching at the high school at the time."[10]

Following the first meeting, Mrs. Lucas had several phone conversations with the

---

1. Transcript of Hearing held October 19, 2004 (hereinafter "Tr.") at 5, 21–22.

2. *Id.* at 5.

3. *Id.* at 6. The Plaintiffs testified that the Debtor's brother, Larry Lyle, was present at the first meeting. *Id.* at 6, 16. The Debtor, however, testified that his brother was not present. *Id.* at 32. Neither party called Larry Lyle to testify. I fail to see the materiality of this discrepancy among the testimonies.

4. *Id.* at 6. Mr. Lucas testified on direct that he could not recall whether the Debtor presented

the business card at the first or second meeting between the parties. *Id.* at 17.

5. *See Ex. A2.*

6. Tr. at 42.

7. *Id.* at 7, 17.

8. *Id.* at 17.

9. *Id.* at 13.

10. *Id.* at 33.

Debtor and arranged for a second meeting to discuss new drawings and a cost estimate for the project.[11] Pursuant to a prior request from the Plaintiffs, the Debtor presented his various licensing papers at the second meeting.[12] The document provided by the Debtor included copies of:

(1) Massachusetts Department of Education Certificate for the field of Industrial Arts, # 267513; (2) American Red Cross Standard and Personal Safety course certification; (3) Massachusetts Department of Public Safety Construction Supervisor License, License Number 046646, effective date 10/31/1992; (4) City of Lynn, Board of Examiners Class 4 Construction License, License Number 2082, License Expiration July 1, 1987; and (5) United States Department of Labor, Occupational Safety and Health Administration Training Course certification.[13] The Debtor testified that upon presentation of these documents, he told the Plaintiffs that the Massachusetts Department of Public Safety Construction Supervisor License was "my last license, and that my [19]97 license had run out in '97, but I had lost it and didn't have a copy of it."[14]

After the second meeting, the Debtor proposed a five-page contract outlining the work to be performed, setting a contract price of $106,000, and including a payment schedule.[15] Mrs. Lucas supplemented the Debtor's proposal with a payment schedule worksheet and two drawings,[16] and Mr. Lucas' father, Robert F. Lucas, Esq., provided a "Construction Agreement Addendum."[17] These three documents constituted the complete contract (the "Contract") which the parties signed on April 29, 2000.[18]

No part of the Contract recites that the Debtor is a licensed contractor or a construction supervisor.[19] The Debtor does not dispute that he was not licensed as either a home improvement contractor or a construction supervisor at the time he contracted with or worked for the Plaintiffs.[20] Furthermore, the Debtor admits that at the time of the Contract he was doing business as Northstar Construction Company and was engaged in trade or commerce within the meaning of Massachusetts General Laws, Chapter 93A, § 2.[21]

After the Debtor and the Plaintiffs executed the Contract, they agreed that the Plaintiffs would pay $33,500 of the Con-

11. *Id.* at 7.

12. *Id.* at 12, 18, 33.

13. *See Ex. A4* at 5.

14. Tr. at 34.

15. *See Ex. A1* at 1–5; Tr. at 13.

16. *See Ex. A1* at 6–8; Tr. at 13.

17. *See Ex. A1* at 9–14; Tr. at 13.

18. Tr. at 13; *see Ex. A1.* The Debtor disputed at trial that *Ex. A1* was the complete contract between the parties. Tr. at 38–39, 43. The dispute, however, in the Debtor's testimony relates to a cash payment transaction associated with the Contract and is not relevant to the issue of whether the Debtor made a mis-

representation that he was licensed. *Id.* at 43.

19. *See Exhibit A1*. Paragraph 2 of the Construction Agreement Addendum states:

All construction shall be completed in a good and workmanlike manner conforming with all applicable codes, regulations and requirements, including but not limited to, the Commonwealth of Massachusetts State Building Code and such conditions that may be imposed or established by the Building Commissioner of the City of Melrose, and consistent with all applicable customs and practices for first class construction.

20. Joint Pre–Trial Statement dated October 13, 2004, at 2 (the "JPTS").

21. *Id.*

tract price in cash.[22] In return, the Debtor agreed to sign a receipt, prepared by Robert F. Lucas, Esq., which read,[23] "I further acknowledge that such payment was made in cash at my express request, and did not constitute an attempt by Bob or Rachel Lucas to effectuate a failure to make any required reportings [sic] under § 6050 of the Internal Revenue Code."[24]

Subsequent to the execution of the Contract and receipt of the cash payment, the Debtor prepared an Application for Building Permit for the Melrose Building Department (the "Application").[25] The Debtor had a conversation with Gregorio, the Building Commissioner of Melrose, regarding how to prepare the Application.[26] Gregorio testified that at the time the Debtor was seeking the permit, he was under the impression that the Debtor was a licensed contractor and that the format of the Application used by the Debtor was for a licensed contractor.[27] The Debtor testified that he informed Gregorio "[t]hat I didn't have one [a license], and that I didn't have the numbers with me, that I had my license at home."[28] Subsequently, the Debtor retrieved his license which had expired in 1997, and returned to input his license information for the permit.[29]

In Section 3 of the Application, the Debtor included his Construction Supervisor License Number 046646 with an expiration date of August 5, 1997, and Northstar Construction Company's Registration Number 110571 with an expiration date of November 3, 1997.[30] In order to complete the Application for Building Permit, the Debtor had to obtain the Plaintiffs' signature.[31] The Debtor testified that he left the Application with the Plaintiffs overnight, picked it up the next day, and completed the permit process by paying a fee to the Melrose Building Department.[32] Mrs. Lucas signed the Application, but denied reading or having had the document overnight.[33] Mrs. Lucas further testified that the Debtor presented her "with a very large clipboard, box of papers rolled over behind the clipboard, pointed to one page and said, 'Mrs. Lucas, I need you to sign right here so I can get your building permit.'"[34]

On June 29, 2000, Gregorio approved the Application, and Building Permit Number 37105 was issued on June 30, 2000.[35] Gregorio testified that as building inspector he could only issue a building permit to a contractor, licensed or not, with the

---

**22.** Tr. at 19, 43; *see also Ex. A3.* The Debtor characterized the cash payment as "a negotiation between the Lucases and I so they could receive a discount on the total contract price[.]" Tr. at 43.

**23.** *Id.* at 19.

**24.** *See Ex. A3.*

**25.** Tr. at 35.

**26.** The Debtor testified that his meeting with Gregorio took place in two meetings for an aggregate of one-half hour. *Id.* at 36. Gregorio contended in his testimony on cross-examination that he spent "no more than a minute" with the Debtor to discuss the Application. *Id.* at 26.

**27.** *Id.* at 24.

**28.** *Id.* at 36.

**29.** *Id.* at 37.

**30.** *Id.* at 25–26; *see also Ex. A4* at 3.

**31.** Tr. at 23, 37.

**32.** *Id.* at 37.

**33.** *Id.* at 15.

**34.** *Id.*

**35.** *See Ex. A4* at 2; *see also* Tr. at 22.

homeowner's signature.[36] Gregorio noted that the significant difference in hiring an unlicensed contractor is that a homeowner would not have recourse to a state guarantee fund if the contractor performed faulty workmanship.[37] On cross examination, Gregorio testified he had read the Application closely, but "slipped on that page" which included the Debtor's expired license and registration information.[38]

Gregorio further testified on cross examination that the Debtor had previously done work for Gregorio's relatives, including his mother, sister and sister-in-law.[39] As to the Debtor's skills, Gregorio testified that the Debtor was "a decent carpenter" and Gregorio would not have recommended him to the Plaintiffs "if I didn't think he was a decent carpenter." [40]

In describing the work he performed on the Plaintiffs' home, the Debtor testified that he "[c]ompleted a 14 by 24 addition with all the extras they asked of me to do and renovated half their house." [41] The Debtor also testified that he had received $100,000 in payment from the Plaintiffs for the work, but that he had spent more than $110,000.[42] On cross examination, the Debtor testified that he had employed 18 to 20 subcontractors for the Plaintiffs' job because the Debtor does not do electrical or plumbing work.[43] The Debtor further explained that between the mid 1990s and his work on the Plaintiffs' home, he was not engaged in the construction business because he was "considered disabled" as a result of fusion surgery on his spine.[44] At the time Debtor was negotiating the Contract, the Debtor testified he was a high school teacher.[45]

Following the Debtor's completion of the work on Plaintiffs' residence, the Plaintiffs made a demand for relief under Massachusetts General Laws Chapter 93A,[46] by letter dated March 27, 2001 (the "Demand Letter").[47] The Demand Letter detailed various alleged defects in the work performed by the Debtor, including: water leaks in the roof and basement; defects in the installation and operation of the heating system; uneven flooring; defects in painting and finish work; and other building code violations.[48] The Plaintiffs requested compensatory damages in the amount of $50,000.

### B. Procedural Background

The Debtor filed a voluntary chapter 7 petition on January 17, 2003. On April 24, 2003, the Plaintiffs filed the Complaint. I held a pre-trial hearing on the matter and the parties filed a Joint Pre–Trial Statement which raised the following issues for trial: (1) whether the Debtor obtained money under a construction contract to

---

36. *Id.*

37. *Id.*

38. *Id.* at 26.

39. *Id.* at 27.

40. *Id.*

41. *Id.* at 37.

42. *Id.*

43. *Id.* at 46.

44. *Id.* at 45.

45. *Id.*

46. Mass. Gen. Laws Ann. ch. 93A, § 2(a) (2002) declares as unlawful any "unfair or deceptive acts or practices in the conduct of any trade or commerce" and a plaintiff successful in an action under the statute is entitled to actual damages, costs, attorney's fees and possibly multiple damages pursuant to Mass. Gen. Laws Ann. ch. 93A, § 11 (2002).

47. *See Ex. A5.*

48. *Id.*

build an addition to the Plaintiffs home by false pretenses, a false representation, or actual fraud, when the Debtor allegedly misrepresented to the Plaintiffs that he was a licensed contractor such that his debt to Plaintiffs should be non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A); and, (2) "whether the provisions of Massachusetts General Laws, Chapter 142A are applicable to the dealings between the parties." [49]

On October 19, 2004, I held an evidentiary hearing on the matter. At the close of the hearing, I ruled that the Plaintiffs had failed to establish damages and, therefore, did not establish a requisite element to prove non-dischargeability of the debt owed them by the Debtor under the controlling case in this circuit, *Palmacci v. Umpierrez*, 121 F.3d 781 (1st Cir.1997). Consistent with my holding, I entered judgment for the Debtor. On appeal, United States District Court Judge Douglas P. Woodlock found that I had led the Plaintiffs to believe at trial:

> (1) that they had provided sufficient evidence of damages; (2) that, in any event, particularized evidence would not be necessary to succeed at that stage of the proceedings; and (3) that damages were not in dispute and, consequently, that the final *Palmacci* requirement had been met.

*Lucas v. Lyle*, No. 04–12720–DPW, slip op. at 3 (D.Mass. March 8, 2005). Accordingly, Judge Woodlock ordered the case remanded to afford the Plaintiffs the opportunity to submit additional evidence on the issue of damages with the caveat that "[o]f course, if the bankruptcy judge were to determine that one of the other *Palmacci* requirements has not been met, no such damages inquiry will be necessary." *Lucas v. Lyle*, No. 04–12720–DPW, slip op. at 3 (D.Mass. March 8, 2005). I held a hearing on remand on April 13, 2005, and upon the assent of the parties, took the matter under advisement on the evidentiary hearing record to consider the remaining elements of the *Palmacci* test.

## III. Analysis

Section 523(a)(2)(A) of the Bankruptcy Code provides for an exception from discharge for any debt of an individual debtor

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

In the First Circuit, a creditor must satisfy the elements of the *Palmacci* test to establish that a debt is non-dis-

---

49. JPTS at 3. In neither the JPTS nor at the evidentiary hearing did the parties make clear the relevance or applicability of Chapter 142A to this dischargeability proceeding. Chapter 142A regulates home improvement contractors in Massachusetts. Mass. Gen. Laws Ann. ch. 142A, § 2 (2002) requires that an agreement to perform residential contracting services in an amount over $1000 be in writing and include, among other information, the contractor's registration number. Mass. Gen. Laws Ann. ch. 142A, § 9 (2002) provides "[n]o contractor ... shall undertake, offer to undertake, or agree to perform residential contracting services unless registered there-

for... [,]" however, § 14 provides that "any person who engages in the business of a contractor ...on other than a full-time basis, and who has earned in gross revenues, as a contractor ..., less than five thousand dollars in the previous twelve month period" is exempt from the requirement of registration pursuant to Chapter 142A. To the extent that the statute is applicable, I conclude that the Debtor is exempt pursuant to § 14 given his undisputed testimony that prior to the Contract and work he performed for the Plaintiffs, the Debtor had not been engaged in the construction business since the mid 1990s. Tr. at 45.

chargeable under section 523(a)(2)(A).[50] The *Palmacci* test requires that the creditor demonstrate:

1. The debtor made a knowingly false representation or one made in reckless disregard of the truth;

2. The debtor intended to deceive;

3. The debtor intended to induce the creditor to rely upon the false statement;

4. The creditor actually relied upon the misrepresentation;

5. The creditor's reliance was justifiable; and

6. The reliance upon the false statement caused the damage.[51]

 "The standard of proof of each element of a § 523 claim is by a preponderance of the evidence."[52] "The burden of proof and the burden of production as to each element rests with the party contesting the dischargeability of a particular debt under ... § 523."[53] Therefore, if the Plaintiffs have failed to establish any of the *Palmacci* elements by a preponderance of the evidence, I must reject their non-dischargeability claim.[54]

### 1. False Representation

██ The Plaintiffs contend that the Debtor falsely represented that he was a licensed contractor in order to induce them to contract. The testimony of the Plaintiffs and Gregorio contrasts with that of the Debtor in a "they said—he said" fashion: the Plaintiffs and Gregorio assert that the Debtor misrepresented himself to be a licensed contractor, while the Debtor contends he represented from the very first meeting that his licenses had expired.[55] While there can be no way to divine absolutely from the testimony and evidence before me whether the Debtor indeed said the magic words "I am a licensed contractor," the evidence as a whole indicates he did not.

The documentary evidence in this case supports the Debtor's version of events that he informed the Plaintiffs that he had been licensed, but that his licenses had since expired. First, both Plaintiffs testified that at their request the Debtor presented them with documentation concerning his licenses and that it was the same documentation attached to the Application.[56] That documentation included a license from the City of Lynn with a clearly marked expiration date of July 1, 1987, and a Construction Supervisor License with an effective date of October 31, 1992, but with no expiration date. If the Debtor had misrepresented to the Plaintiffs that he was a licensed contractor to induce

---

**50.** *See Palmacci v. Umpierrez,* 121 F.3d 781, 786 (1st Cir.1997).

**51.** *McCrory v. Spigel (In re Spigel),* 260 F.3d 27, 32 (1st Cir.2001) (citing *Palmacci,* 121 F.3d at 786).

**52.** *Palmacci.* 121 F.3d at 787.

**53.** *Id.*

**54.** *Id.*

**55.** The Plaintiffs made much of the fact that the Debtor underestimated the construction costs in Section 7 of the Application for Building Permit as compared to the Contract cost in order to defray permit costs. *See* Tr. at 28–

29; *see also Ex. A4* at 4. While I acknowledge that the Debtor made this representation and gave his signature to verify its accuracy in the Application under the pains and penalties of perjury, it nonetheless does not impugn the Debtor's credibility as to whether he made a misrepresentation to the Plaintiffs that he was a licensed contractor. This is so because in Section 3 of the Application for Building Permit, the Debtor included and specifically set forth his license numbers and expiration dates which showed that the Debtor's licenses had expired. *See Ex. A4* at 3.

**56.** *See Ex. A4.*

them to contract, it would make no sense for him to provide the Plaintiffs with documentation showing an expired license. Furthermore, the Plaintiffs gave no testimony as to why, if licensure was their "standard" by which to contract with the Debtor, they were satisfied with the Debtor's production of an expired license and a license with a validity that was vague at best. Indeed, the Debtor's inclusion of his Massachusetts Department of Education Certificate in Industrial Arts along with his expired licenses, corroborates his contention that he told the Plaintiffs at the first meeting that he was unlicensed but maintained his contracting skills through his teaching position.

Second, the Application specifically included the Debtor's license numbers and expiration dates which indicated the Debtor's licenses had expired. If the Debtor had made the alleged misrepresentation to the Plaintiffs, it would be inconsistent for him to again present them with a document that indicated that he was not licensed at all.

Even though the form used by the Debtor for the Application was that used by licensed contractors, it appears this was an honest mistake because he included his license expiration dates. Although Gregorio testified that he was under the impression that the Debtor was licensed, Gregorio did not testify that the Debtor had made any such representation to him. In fact, the Debtor testified that he specifically told Gregorio that he was not licensed. Either way, if Gregorio had not failed to read the page of the Application with the expired license information before he issued the building permit he would have been aware that the Debtor was unlicensed.

Finally, the Plaintiffs' credibility is impugned by the fact that whether or not the Debtor was licensed does not appear to have been of paramount import at the time of the Contract as it is in this proceeding. The Plaintiffs had counsel prepare an addendum to the Contract but did not require any representation therein by the Debtor that he was licensed. Although the Plaintiffs were meticulous enough to require a receipt of their cash payment which indicated the Plaintiffs were not engaged in any sort of tax evasion, they again were not interested enough to obtain any representation in writing that the Debtor was a licensed contractor. The Plaintiffs made much of the fact that the Debtor presented them with a business card containing his license numbers. The attention to the business card, however, does not correlate to the inattention Mrs. Lucas placed on the Application which she signed without reading.

The Plaintiffs have not satisfied by a preponderance of the evidence their burden of proof as to this element. Indeed, the exhibit which most seriously undercuts the Plaintiffs' allegation and testimony that the Debtor misrepresented that he was licensed, the Application and the licensing documents contained therein, was offered and introduced by the Plaintiffs themselves. Accordingly, I conclude that the Plaintiffs have failed to prove by a preponderance of the evidence that the Debtor made a false representation that he was a licensed contractor. The Plaintiffs have failed to satisfy this element of the *Palmacci* test.

### 2. Intent to Deceive

As the availability of direct evidence to prove a debtor's intent to deceive a creditor is often unlikely to be obtained, "a creditor may present evidence of the surrounding circumstances from which in-

tent may be inferred."[57] Although an intent to deceive can be inferred from surrounding circumstances, "there still must be evidence of the circumstances which the plaintiff believes present a picture of deceptive conduct"[58] and "the court may choose to infer intent or not to draw that inference, based on all the evidence."[59] The evidence I may consider includes the subsequent conduct of the Debtor after the alleged false representation since subsequent conduct can reflect a debtor's state of mind at the time the representation is made.[60]

█ Even if the Debtor made a representation at the first meeting that he was licensed, his production of expired licenses at the second meeting and prior to the execution of the Contract does not lend itself to a scheme of deception by the Debtor to induce the Plaintiffs to contract. Furthermore, the Debtor clearly set forth his expired licenses in the Application which Mrs. Lucas signed and which Gregorio reviewed and approved. This is not the behavior of a individual with an intent to deceive.

Even if I were to have concluded above that the Debtor did make a false representation to the Plaintiffs, I cannot infer an intent to deceive based upon the evidence before me and conclude that the Plaintiffs failed to prove by a preponderance of the evidence that the circumstances surrounding the alleged false representation indicate an intent to deceive by the Debtor. Accordingly, the Plaintiffs would fail on this element of the *Palmacci* rest as well.

### 3. Debtor's Intent to Induce Reliance by Plaintiffs

Again, there is insufficient evidence before me to satisfy the Plaintiffs' burden to prove by a preponderance of the evidence that the Debtor intended to induce the Plaintiffs' reliance on his alleged false statement that he was a licensed contractor. This is the case for the same reasons that the Plaintiffs have failed to prove that the Debtor made a false representation and had the intent to deceive. Accordingly, I conclude that the Plaintiffs have not met their burden of proof to show that the Debtor intended Plaintiffs to rely on an alleged false representation that he was licensed in order to obtain the Contract and payments thereunder.

### 4. Plaintiffs' Actual Reliance

Mr. Lucas testified that he relied upon the alleged misrepresentation by the Debtor because he "wanted to be sure he [the Debtor] would do a good job .... wanted to be sure he was a professional .... [and] we were using that as a standard for the contractors we were deciding on to hire for the job."[61] Mrs. Lucas testified similarly that she relied upon the Debtor's alleged representation that he was licensed in entering into the Contract. If I take the Plaintiffs' testimony at face value, in the absence of my determinations as to the previous *Palmacci* elements, it would appear that the Plaintiffs have established actual reliance. Consistent with my previous conclusion, however, that Plaintiffs have failed to establish by a preponderance of the evidence that the Debtor even

57. *Eastern Food Service, Inc. v. Leger (In re Leger)*, 34 B.R. 873, 877 (Bankr.D.Mass.1983); see also *Palmacci*, 121 F.3d at 790 (noting "that intent to deceive may be inferred from the totality of the circumstances, including circumstantial facts.").

58. *In re Leger*, 34 B.R. at 878.

59. *Palmacci*, 121 F.3d at 790.

60. *See Williamson v. Busconi*, 87 F.3d 602, 603 (1st Cir.1996).

61. Tr. at 17.

made the false representation, I conclude that Plaintiffs must necessarily fail as to the element of actual reliance as it has not been proven that the Debtor made a false representation upon which Plaintiffs could rely.

### 5. Justifiable Reliance

■■■■ Even if the Plaintiffs had proven the previous four elements of the *Palmacci* test, they must also prove by a preponderance of the evidence that their reliance was justifiable. In evaluating whether the Plaintiffs' reliance here was justifiable, "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."[62] A plaintiff's reliance is not justifiable and he may not recover, however, "if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."[63] In other words, a plaintiff may not act like an ostrich with its head in the sand when confronted with evidence that a debtor's representation was false and thereafter claim that their reliance was justifiable. That is exactly what the Plaintiffs did in this case.

The Plaintiffs were sophisticated enough to request documentation of licenses, but when presented with expired licenses, the Plaintiffs failed to question the Debtor regarding same. The Plaintiffs were sophisticated enough to seek the advice and assistance of counsel in drafting an addendum to the Contract and a receipt of the cash payment, but did not read the Application before signing. A cursory investigation or review of the licensing documents they had in hand at the second meeting or into the Application would have revealed that the Debtor was unlicensed. Accordingly, I conclude that the Plaintiffs have failed to establish by a preponderance of the evidence that their reliance is justifiable and as such they have failed to satisfy yet another element of the *Palmacci* test.

### 6. Did Reliance Upon the False Statement Cause Plaintiffs' Damages

As noted by Judge Woodlock in his opinion remanding the matter, no damages inquiry is required if I conclude that any one of the other *Palmacci* elements has not been met. As I have concluded that the Plaintiffs have failed to establish by a preponderance of the evidence that the Debtor made a false representation that he was licensed, I need not decide the damages element.[64]

**62.** *Field v. Mans,* 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

**63.** *Id.* (quoting *Restatement (Second) of Torts* (1976), § 541, Comment a).

**64.** I note that in the case of *Gem Ravioli, Inc. v. Creta (In re Creta),* 271 B.R. 214 (1st Cir. BAP 2002), the Bankruptcy Appellate Panel for the First Circuit (the "B.A.P.") reversed the bankruptcy court's conclusion that the plaintiff-creditor had failed to prove that the debtor's misrepresentation that he was licensed refrigeration technician was the cause of the plaintiff's damages where the air conditioners installed by the debtor had ceased

working. After vacating the bankruptcy court's judgment for the debtor, the B.A.P. remanded the matter to the bankruptcy court to consider under the appropriate proximate causation standard. The B.A.P. instructed that the bankruptcy court should have considered each element of proximate causation, causation in fact and legal causation, when determining whether the misrepresentation as to licensing caused the plaintiff's damages. *Id.* at 290.

Although *In re Creta* and the matter before me have similar factual underpinnings, I need not reach the issue raised by *In re Creta* as I am unable to conclude on the evidence before me that the Plaintiffs have proved the other

## CONCLUSION

Based upon the foregoing, I conclude that the Plaintiffs have failed to prove by a preponderance of the evidence the required elements of the *Palmacci* test, namely that the Debtor made a false representation. I shall enter judgment for the Debtor by separate order which renders the debt owed by the Debtor to the Plaintiff's dischargeable.

elements of the *Palmacci* test. Absent such a conclusion, I need not undertake a proximate causation analysis as to any damages the Plaintiffs may allege.